IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

KEVIN A. MCGRAW,

      Plaintiff,

v.                                Case No.: 3:18-cv-01042

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

      Defendant.

### PROPOSED FINDINGS AND RECOMMENDATIONS

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 14, 15).

      The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On November 18, 2016 and June 1, 2017, Plaintiff Kevin A. McGraw ("Claimant"), completed applications for DIB and SSI, respectively, alleging a disability onset date of August 8, 2016 due to severe restrictive lung disease, obstructive sleep apnea, arthritis in all joints, head injury/fractured skull, heart problems – right side not functioning properly, back problems, restless leg syndrome, shoulder problems, knee problems, high blood pressure, right shoulder injury, high cholesterol, hip and pelvic injuries, post-traumatic stress disorder ("PTSD") – violent nightmares, crushed sternum, depression, anxiety, speech impairment, and vision problems. (Tr. at 261, 263, 396). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 16). Claimant then filed a request for an administrative hearing, which was held on February 14, 2018 before the Honorable Maria Hodges, Administrative Law Judge. (Tr. at 36-60). By written decision dated February 28, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 16-28). The ALJ's decision became the final decision of the Commissioner on April 19, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11). Claimant filed a Brief in Support of Motion for Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 14, 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 52 years old on his alleged onset date and 53 years old on the date of the ALJ's decision. (Tr. at 26). Claimant completed high school and previously worked as a bricklayer for over 27 years. (Tr. at 397-98).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of

"none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2021. (Tr. at 18, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 8, 2016, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: carpal tunnel syndrome, ulnar nerve

impairment, degenerative disc disease, hypertension, chronic obstructive pulmonary disease, sleep apnea, and neurocognitive disorder. (Tr. at 18-19, Finding No. 3). The ALJ considered Claimant's depression and anxiety, but found these impairments to be non-severe. (Tr. at 19).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, kneel, and crouch; occasionally stoop and crawl; avoid concentrated exposure to extreme cold, hazards of moving machinery and unprotected heights, and vibration; avoid even occasional exposure to pulmonary irritants, extreme heat, and humidity; occasionally reach overhead; and frequently reach in all other directions; frequently finger and handle bilaterally; and limited to simple, routine, and repetitive tasks.

(Tr. at 21-26, Finding No. 5). At the fourth step, the ALJ determined that Claimant could not perform any of his past relevant work. (Tr. at 26, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 26-27, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1964 and was defined as a person closely approaching advanced age on the alleged disability onset date through the date of the decision; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 26, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ

determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including light-level work as a routing clerk, price marker, or inspector. (Tr. at 26-27, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant raises three identifiable challenges to the Commissioner's decision. First, Claimant argues that the ALJ "summarily ignored" the medical source opinions of Robert Walker, M.D., who conducted an independent medical examination of Claimant on April 3, 2012; Justin Smith, D.O., a treating physician, who completed a functional capacity evaluation form dated December 22, 2016; and Brandon Shiflett, M.D., a treating physician, who signed a mobility-impaired placard application for Claimant on February 1, 2018. (ECF No. 14 at 12-13). In a second challenge to the Commissioner's decision, Claimant asserts that the ALJ failed to consider whether the combined effect of his impairments met a recognized listing. (*Id.* at 14-15). Finally, in his third challenge, Claimant contends that the ALJ failed to fully develop medical evidence regarding his arthritis in all joints, head injury, skull fracture, heart problems, restless leg syndrome, shoulder problems, speech impairment, low IQ, depression, carpal tunnel and ulnar syndromes, anxiety, post-traumatic stress disorder, neck and knee problems, hernia, and kidney stones. (*Id.* at 12).

In response to Claimant's challenges, the Commissioner argues that the ALJ properly considered the opinion evidence and the combined effect of Claimant's impairments. (ECF No. 15). The Commissioner also notes that Claimant does not identify any listing that he purportedly meets, any inadequacies that warranted further

development of the record, or any evidence that could have been adduced that might have changed the ALJ's decision. (*Id.*).

## V.   <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### *A. Treatment Records*

#### 1. Before alleged onset of disability

Many years before Claimant's alleged onset of disability in August 2016, Claimant suffered two significant accidents. First, in May 1996, Claimant and three of his coworkers reportedly fell 32 feet after scaffolding collapsed while Claimant was working as a bricklayer. (Tr. at 445, 712). Claimant stated that he hit his head on a windowsill as he fell and that the scaffolding, blocks, bricks, mortar, boards, and tools landed on top of him. (Tr. at 445-46). Claimant's injuries were reportedly all above his waist, including eight broken ribs, a fractured sternum, three crushed vertebrae, a cracked skull, and a cut above his eye. (Tr. at 446, 712, 873). In September 1997, Claimant's sternum was shaved, the shattered bone was removed, and his sternum was re-fractured and "wired back together." (Tr. at 446). Claimant participated in physical therapy after the accident and was "off work" for approximately three years due to his injuries. (Tr. at 432-39, 712).

Years later,  on August 30, 2011, while Claimant was mowing his lawn on a riding lawnmower, a woman drove into his yard, struck him, rolled over the lawnmower, and dragged Claimant for 40 yards before coming to a stop. (Tr. at 465, 829). Claimant evidently did not know the woman, but he reported to medical providers that she "was on drugs" and screaming "I'm going to kill you." (Tr. at 465, 712). Claimant suffered hip and back injuries, and he did not return to work for approximately one year. (*Id.*). Claimant

saw a chiropractor from September 2011 through January 2012. (Tr. at 469, 825-70).

On September 28, 2015, Claimant presented to the emergency room at St. Mary's Medical Center due to back pain. (Tr. at 532). He reported that he was carrying a 48-pound brick at work, "as per usual," but that when he rotated his body to the right he experienced a sudden onset of extreme pain in his low back and fell to the ground. (Tr. at 530). Claimant's x-ray did not show any acute findings. (*Id.*). He was treated with prednisone, Robaxin, and ibuprofen, and was sent home. (*Id.*).

The following day, on September 29, 2015, Claimant saw James Reynolds, M.D., for a second opinion regarding his low back pain. (Tr. at 530). Claimant stated that he was up all night in pain. (*Id.*). On examination, Claimant had "exquisite tenderness" in his paraspinal musculature in the lumbar region, but he had full muscle strength and no sensory deficits in his lower extremities. (*Id.*). Dr. Reynolds diagnosed Claimant with lumbago with radiculopathy; he prescribed Norco and scheduled Claimant for a lumbar epidural steroid injection (LESI), which Claimant received on October 6, 2015. (Tr. at 530, 534)

On October 24, 2015, Claimant had a lumbar MRI, which showed a right posterior paracentral small disc protrusion with some mild impression of the thecal sac at T12-L1. (Tr. at 533). However, no abnormality was seen which would correlate with Claimant's left-sided symptoms. (*Id.*).

On January 4, 2016, Claimant saw Matthew Werthammer, M.D., for a neurosurgical evaluation. (Tr. at 511). Claimant reported low back pain with intermittent discomfort in his buttocks and proximal legs. (*Id.*). Claimant noted that he continued to work and had one LESI, which was not helpful. (*Id.*). Dr. Werthammer recorded that Claimant's MRI showed mild multilevel disc protrusion with normal alignment and no

areas of severe stenosis or fracture. (Tr. at 512). Dr. Werthammer diagnosed Claimant with a lumbar sprain. (*Id.*). He recommended conservative management, including physical therapy and non-steroid anti-inflammatory drugs, as needed. (Tr. at 513).

On April 20, 2016, Claimant presented to St. Mary's Medical Center, complaining of shortness of breath and cough. (Tr. at 536). He stated that he passed out and vomited that day, which was followed by a headache. (*Id.*). Claimant's EKG, chest x-ray, and CT scan of his head did not demonstrate any acute findings. (Tr. at 537-38). The attending physician, Larry Harman, M.D., diagnosed Claimant with shortness of breath, syncope, and dehydration. Claimant was administered Toradol and discharged in good condition. (Tr. at 539).

On April 22, 2016, Claimant saw Chandos D. Tackett, M.D., complaining of shortness of breath upon minimal exertion. (Tr. at 477). Claimant's EKG was normal, so Dr. Tackett suggested a stress test. (*Id.*). In terms of other complaints, Claimant stated that he was a motocross racer most of his life and had multiple fractures and chronic pain that was not really controlled by tramadol. (*Id.*). Dr. Tackett advised Claimant that his chronic pain was not likely to be controlled by medication for any length of time and he advised against Claimant taking narcotics for pain management. (*Id.*). Claimant was prescribed Advair and rescue inhalers. (Tr. at 479). Dr. Tackett also suggested that Claimant go to a pain clinic for treatment of his chronic pain. (Tr. at 477, 479).

On May 24, 2016, Claimant followed up with Dr. Tackett. Claimant was feeling so much better that he did not wish to proceed with the planned stress test. (Tr. at 474). Claimant stated that he had been busy working as a bricklayer and that as long as he used Advair twice per day and a rescue inhaler as needed, he did not have any shortness of breath or chest pain. (*Id.*). Claimant reported that it was "amazing" how much the

medications helped him. (*Id.*). His labs were unremarkable other than an elevated creatinine of 1.6.[1] (*Id.*). Claimant stated that he was doing okay in terms of his chronic back pain and took tramadol as needed. (*Id.*). Dr. Tackett recommended that Claimant take Tylenol instead of ibuprofen to manage his chronic pain due to his elevated creatinine level and he recommended a sleep study due to Claimant's wife's complaints that Claimant snored and stopped breathing at night. (*Id.*). Other than Claimant's reported hypersomnolence and possible sleep apnea, Dr. Tackett stated that Claimant seemed to be doing okay and was traveling to Michigan for a "firebrick job." (Tr. at 476).

### 2. After alleged onset of disability

On September 6, 2016, Claimant had a spirometry test, which showed moderate restriction. (Tr. at 507). He followed up with pulmonologist, William R. Beam, M.D., two days later to follow up regarding his test results. (Tr. at 542). With respect to Claimant's pulmonary testing, Dr. Beam stated that Claimant's lung volumes showed "possible restriction." (Tr. at 543). Dr. Beam diagnosed Claimant with symptomatic obstructive sleep apnea, possible REM behavior disorder, unexplained dyspnea, restless leg syndrome, hypertension, dyslipidemia, and a history of a fall with possible traumatic brain injury and multiple skeletal fractures. (*Id.*). Dr. Beam prescribed CPAP therapy. (*Id.*).

Claimant had a stress test on September 22, 2016, which was normal. (Tr. at 551-52). On October 12, 2016, Claimant had a chest CT scan, which showed some ground glass

---

[1] "The normal range for creatinine in the blood may be 0.84 to 1.21 milligrams per deciliter (74.3 to 107 micromoles per liter), although this can vary from lab to lab, between men and women, and by age. Since the amount of creatinine in the blood increases with muscle mass, men usually have higher creatinine levels than do women." Generally, a high serum creatinine level means that the kidneys are not functioning well. However, the creatinine level may temporarily increase if the individual is dehydrated, has a low blood volume, eats a large amount of meat, or takes certain medications. https://www.mayoclinic.org/tests-procedures/creatinine-test/about/pac-20384646

densities in the lower lobes of Claimant's lungs, but it did not show any significant lung disease or pulmonary fibrosis. (Tr. at 555). Claimant followed up with his treating provider, Dr. Smith, the following day. His medical issues were listed as hypertension, high cholesterol, restrictive lung disease, and obstructive sleep apnea. (Tr. at 653). The only complaint noted on his review of symptoms was restrictive lung disease, and there were no abnormalities on physical examination. (Tr. at 653-54). Dr. Smith adjusted Claimant's blood pressure and cholesterol medications, prescribed Advair, and ordered an echocardiogram. (Tr. at 654).

On October 25, 2016, Claimant's echocardiogram was performed, and the results were normal. (Tr. at 560, 708-09). Claimant's ejection fraction was 55 to 60 percent. The following month, on November 17, 2016, Claimant saw pulmonologist, Peter Ottaviano, D.O., due to shortness of breath. (Tr. at 568). Dr. Ottaviano noted that Claimant worked as a bricklayer from 1989 to the present, which included working in aluminum and glass plants. (*Id.*). He noted that Claimant's chest CT showed some evidence of ground glass and his pulmonary function test showed restrictive lung disease, but his stress test was normal. (Tr. at 570). Dr. Ottaviano switched Claimant from Advair to Symbicort. (*Id.*).

On November 29, 2016, Claimant had a sleep study after which Dr. Beam again diagnosed him with obstructive sleep apnea. (Tr. at 681). Claimant was instructed to continue CPAP therapy. (*Id.*). The following month, on December 8, 2016, Claimant saw Courtney Nichols, M.D. His health issues were listed as hypertension, high cholesterol, restrictive lung disease, GERD, and arthritis. (Tr. at 649). His only complaint was shortness of breath, and there were no abnormalities noted on his physical examination. (Tr. at 649-50). Claimant specifically denied having any chest pain, lightheadedness, edema, dizziness, or reflux symptoms. (Tr. at 649). He also stated that tramadol was

helping his chronic pain, although his pain was the worst in the mornings. (*Id.*). Claimant was continued on medications. (Tr. at 650).

On December 17, 2016, Claimant presented to St. Mary's Medical Center with bilateral arm pain, which was diagnosed to be cervical radiculopathy. (Tr. at 584). A CT scan was taken of his cervical spine, which showed degenerative disc disease at C3-4. (Tr. at 625). It was noted that if Claimant had radicular symptoms, then an elective MRI would be more appropriate to assess the central canal. (*Id.*). Claimant also complained of mild chest pain when he took deep breaths. (Tr. at 663). However, his chest x-ray was normal. (Tr. at 678).

On December 22, 2016, Claimant saw Dr. Smith regarding a tingling sensation that started in his right hand and subsequently extended into his left hand. (Tr. at 647). Claimant complained of radiculopathy, shortness of breath, and osteoarthritis. (*Id.*). Yet, the only abnormality noted on his physical examination was reduced range of motion in his shoulders. (Tr. at 648). Claimant's blood pressure was elevated at 148/98; thus, Dr. Smith increased Claimant's blood pressure medication. (*Id.*). To address Claimant's other issues, Dr. Smith prescribed gabapentin and stated that Claimant needed an MRI to further evaluate his radiculopathy symptoms. (*Id.*).

On January 26, 2017, Claimant's cervical spine MRI was performed. (Tr. at 590). It showed that Claimant had degenerative changes; moderate spinal canal stenosis at C3-4; and acquired bony neural foraminal stenosis as several levels, which was worse on the right. (*Id.*). The interpreting radiologist stated that nerve root impingement within the neural foramen could not be excluded. (Tr. at 590-91).

On February 2, 2017, Claimant followed up with Dr. Smith, regarding his chronic neck pain. (Tr. at 639). Claimant reported numbness and tingling, but his muscle strength

was normal. (Tr. at 640). Dr. Smith reduced Claimant's dosage of Neurontin because Claimant reported feeling "out of it," and he referred Claimant to a neurosurgeon and pain management clinic. (*Id.*).

On February 6, 2017, Claimant saw neurosurgeon, Dr. Werthammer, regarding his cervical pain and dysesthesias in his upper extremities. (Tr. at 779). Claimant's memory was intact; he followed complex commands briskly; and he had full motor strength except for his grip and intrinsic muscles, which were mildly reduced at 4+/5. (Tr. at 780). Claimant's Spurling test[2] was negative bilaterally, and his gait was normal. (Tr. at 780). However, Claimant had a positive Tinel's sign[3] in his left wrist and he was somewhat hyperlexic. (*Id.*). Dr. Werthammer noted that Claimant's cervical spine MRI showed multilevel spondylosis with moderate stenosis at C3-4. (*Id.*). He felt that some of the findings may be related to early myelopathy and planned to obtain a nerve conduction study to determine if Claimant had concomitant peripheral nerve entrapment syndrome. (*Id.*). Dr. Werthammer discussed the option of a discectomy and fusion at C3-4, but explained that the goal would be to prevent further decline, as it would not be expected to improve Claimant's chronic pain. (*Id.*). Claimant's nerve conduction study was taken on March 6, 2017. The results were consistent with mild right carpal tunnel syndrome and mild bilateral ulnar neuropathies. (Tr. at 785).

---

[2] "The Spurling test helps to diagnose cervical radiculopathy." It involves the patient bending his or her head toward the symptomatic side, as the examiner applies pressure to his or her head, and the examiner may or may not extend and rotate the patient's neck during the test. A positive Spurling test result means that the patient feels pain radiate into his or her arm during the test. https://www.healthline.com/health /spurling-test#techniques

[3] "Tinel's sign: The sign that a nerve is irritated. Tinel's sign is positive when lightly banging (percussing) over the nerve elicits a sensation of tingling, or 'pins and needles,' in the distribution of the nerve. For example, in carpal tunnel syndrome, where the median nerve is compressed at the wrist, the test for Tinel's sign is often positive, eliciting tingling in the thumb, index, and middle fingers." https://www.medicinenet.com/script/main/art.asp?articlekey=16687

On June 15, 2017, Claimant presented to neurosurgeon, Anthony Alberico, M.D., complaining of "fairly severe" pain in his thoracic spine and neck, which radiated into his shoulders. (Tr. at 741). He also reported paresthesia in his arms and hands, mild right carpal tunnel syndrome, and bilateral ulnar neuropathy. (Tr. at 741, 743). (*Id.*). Dr. Alberico planned to obtain an MRI of Claimant's thoracic spine and considered whether Claimant would benefit from surgery to decompress his peripheral nerves. (Tr. at 742-43).

Claimant's thoracic spine MRI was taken on July 5, 2017. It showed mild thoracic degenerative disc disease, a small disc protrusion at T12-L1, and mild chronic compression fractures of T7 and T8, but Claimant did not have any significant central canal or foraminal stenosis, acute fractures, or subluxation. (Tr. at 740).

On July 31, 2017, Claimant followed up with Dr. Alberico. His primary pain complaints related to his mid to low thoracic region. (Tr. at 737). Claimant also had bilateral carpal tunnel ulnar neuropathy. (*Id.*). On examination, Claimant's sensation was only somewhat diminished in the distal aspect of his hands intermitted, his Phalen's sign was positive,[4] his jerk reflex was absent in his biceps and triceps,[5] and he had a questionable Hoffman's sign;[6] however, his motor strength was approaching 5/5, his knee

---

[4] The Phalen's test is used to diagnose carpal tunnel syndrome. https://www.physio-pedia.com/Phalen%E2%80%99s_Test

[5] The biceps reflex is mediated by the C5 and C6 nerve roots and the triceps reflex is mediated by the C6 and C7 nerve roots. https://informatics.med.nyu.edu/modules/pub/neurosurgery/reflexes.html

[6] The Hoffman's sign test "examines a person's reflexes, or how [the person's] body reacts to stimulation of the nervous system." It "is not the only test a doctor will use to see if a person has nerve damage because the test can be positive even when a person is not experiencing any symptoms associated with an injury or chronic condition." The examiner holds the person's middle finger and flicks the finger nail. "If there is no movement in the index finger or thumb after this motion, the person has a negative Hoffman's sign. If the index finger and thumb move, the person has a positive Hoffman's sign."

and ankle jerks were normal, and he had no obvious clonus. (*Id.*). Dr. Alberico diagnosed Claimant with bilateral carpal tunnel syndrome, a herniated disc at C3-4, degenerative disc disease in his lumbar spine, and remote history of minor thoracic compression fractures. (Tr. at 738). He recommended proceeding with carpal tunnel release surgery, beginning with Claimant's left extremity. (*Id.*).

On August 30, 2017, Claimant saw neurosurgeon, Dwight Saulle, M.D., for a second opinion regarding his carpal tunnel and ulnar nerve issues. On examination, Claimant had full cervical and lumbar range of motion and no muscle spasm, point tenderness, or bony step-offs. (Tr. at 748). His lungs were clear to auscultation; his memory was intact; and he followed complex commands briskly. (*Id.*). He had mildly reduced muscle strength of 4/5 in his right triceps and biceps, mildly reduced grip strength of 4+/5, positive Tinel's and Phalen's signs in his right wrist, and positive bilateral ulnar nerve compression. (*Id.*). However, Claimant's sensation was intact, his gait was normal, and his Spurling test for cervical radiculopathy was negative bilaterally. (*Id.*). Dr. Saulle noted the results of Claimant's diagnostic testing, stating that Claimant's cervical spine MRI showed kyphotic angulation and some foraminal narrowing at C3-4, but no spinal cord compression or signal changes. (*Id.*). Further, Dr. Saulle recorded that Claimant's thoracic spine MRI showed chronic compression fractures, but it was not significant for any spinal cord compression, signal changes, or foraminal stenosis. (*Id.*). Finally, Dr. Saulle considered that Claimant's EMG showed right carpal tunnel syndrome and bilateral ulnar nerve compression. (Tr. at 749). Dr. Saulle diagnosed Claimant with right carpal tunnel syndrome and bilateral cubital tunnel syndrome and planned to proceed with surgery on Claimant's right extremity, as Claimant was right-handed and his symptoms on his right side bothered him more. (*Id.*). Dr. Saulle advised Claimant that

his symptoms did not appear to be originating from his neck; thus, surgery in that area was not an advisable option, although Claimant could be reevaluated if his symptoms worsened or he began to experience radiculopathy or myelopathy. (*Id.*). Claimant's right carpal tunnel release and ulnar nerve decompression surgeries were performed on September 11, 2017. (Tr. at 752).

On September 21, 2017, Claimant had a pulmonary function test, which showed moderately severe restriction. (Tr. at 760). He followed up with pulmonologist, Yousef Shweihat, M.D., one week later, on September 28, 2017, reporting that his shortness of breath was stable. (Tr. at 763). Dr. Shweihat attributed Claimant's restricted breathing to thoracic cage abnormality due to his history of rib, sternal, and back fractures and back disease. (Tr. at 764). Therefore, Dr. Shweihat did not advise any intervention and recommended repeating Claimant's pulmonary function testing in one year to make sure that the condition as stable. (*Id.*). Also, Dr. Shweihat referred Claimant for pulmonary rehabilitation to strengthen his exercise and breathing capacity in preparation for his expected cervical and lumbar spine surgeries. (*Id.*).

On November 14, 2017, Claimant saw Katie Bazell, APRN, and reported that his symptoms were improved following his carpal tunnel and ulnar release surgeries the prior month. (Tr. at 768). Surgery was planned to address his left-sided symptoms. (Tr. at 770). Therefore, Claimant proceeded with left carpal tunnel and ulnar nerve decompression surgeries on November 27, 2017. (Tr. at 773).

Claimant followed up with Nurse Bazell on January 9, 2018. He reported that his symptoms had significantly improved. (Tr. at 814). Claimant still had some neck pain, which extended into his shoulders and was worse on the left. (*Id.*). He also still had numbness and tingling in his fingers. (*Id.*). On examination, his sensation was intact,

17

except that his fingertips were numb, and his muscle strength was normal, except that his strength upon extension of his left knee was mildly reduced at 4+/5. (*Id.*). Nurse Bazell discussed treatment options with Claimant, including continued conservative measures such as physical therapy and injections, as opposed to a cervical fusion. (*Id.*). Claimant planned to discuss the options with his wife before making a decision. (*Id.*).

On February 1, 2018, Claimant saw internist, Brandon Shiflett, M.D., reporting that his shortness of breath was worsening, his hypertension and high cholesterol were well-controlled on current medications, and his chronic pain was tolerable with tramadol, but still impeded his daily activities. (Tr. at 819). Claimant also reported insomnia and anxiety, noting that his disability hearing was in two weeks. (Tr. at 820). Claimant reported that due to shortness of breath, he limited his activity to less than 200 feet before he became exhausted. (*Id.*). However, on examination, Claimant's oxygen saturation levels, as measured by a pulse oximeter, were 97 percent at rest and 92 percent with ambulation. (*Id.*).[7]  No abnormalities were listed on Claimant's respiratory examination. (*Id.*). In fact, Claimant had normal respiratory effort and auscultation. (*Id.*). Nevertheless, Dr. Shiflett signed Claimant's Division of Motor Vehicle's application for a mobility-impaired placard, checking the box which stated that Claimant could not walk for 200 feet without stopping to rest. (Tr. at 820, 823).

### B. Evaluations and Opinions

#### 1. Before alleged onset of disability

Claimant underwent a neuropsychological evaluation performed by James F. Phifer, Ph.D., in 1998, following Claimant's 1996 work injury in which he fell from

---

[7] A pulse oximeter measures how much oxygen a person's blood is carrying. "Most people need an oxygen saturation level of at least 89% to keep their cells healthy." https://www.thoracic.org/patients/patient-resources/resources/pulse-oximetry.pdf.

scaffolding that collapsed. Dr. Phifer noted that Claimant exhibited a pattern of post-traumatic headaches with associated phonophobia and photophobia, irritability, intolerance of stimulation, inability to manage simultaneous mental demands, cognitive dysfunction, decreased mental processing speed, and insomnia consistent with post-concussive disorder. (Tr. at 459). Dr. Phifer also assessed that Claimant had a mild-to-moderate decline in his general level of intellectual functioning. (*Id.*). His full scale IQ score was 76 on examination, which was in the borderline impaired range. (*Id.*). Dr. Phifer also stated that there was evidence that Claimant suffered from major depressive disorder and anxiety disorder. (Tr. at 460).

On April 3, 2012, Robert B. Walker, M.D., conducted an independent medical examination of Claimant at the request of Claimant's attorney following the August 30, 2011 incident in which Claimant was struck by an automobile while mowing his lawn. In his report dated July 10, 2012, Dr. Walker assigned whole person injury and impairment ratings to Claimant based on the American Medical Association Guides to the Evaluation of Permanent Impairment, Fourth Edition ("AMA Guides"), which is used to evaluate workers' compensation claims in the state of West Virginia. (Tr. at 469-70). Based on Claimant's range of motion in his cervical spine, Dr. Walker assigned a whole person permanent impairment rating of 9 percent; based on Claimant's range of motion in his right shoulder, Dr. Walker assigned an impairment rating of 6 percent; based on Claimant's range of motion in his right hip and right knee, Dr. Walker assigned a 6 percent rating for Claimant's lower extremity; and, finally, although Dr. Walker was not a mental health professional, he consulted the DSM-IV and assigned a 15 percent rating for Claimant's post-traumatic stress disorder. (Tr. at 469-70). Dr. Walker combined the rating related to Claimant's cervical spine, right shoulder, and PTSD for a total whole

person impairment rating of 28 percent for the injuries sustained in the August 2011 incident. (Tr. at 470).

### 2. After alleged onset of disability

On December 22, 2016, Dr. Smith completed an RFC evaluation form, indicating that Claimant's primary diagnoses were restrictive lung disease and severe back problems. (Tr. at 587). Claimant's secondary diagnoses included high blood pressure and cholesterol, and his "other conditions" were listed as arthritis in all joints, sleep apnea, bilateral shoulder pain, and heart problems. (*Id.*). Dr. Smith assessed that Claimant could stand and/or walk for less than two hours and sit for less than two hours in an eight-hour workday; needed to alternate between standing and sitting every 10 to 15 minutes; could occasionally climb ramps/stairs, kneel, or crouch, but never climb ladders/ropes/scaffolds or crawl; had limited ability to reach and feel; and must avoid concentrated exposure to wetness and moderate exposure to extreme temperatures, humidity, fumes, and hazards. (*Id.*).

On April 7, 2017, Claimant had a mental status examination performed by psychologist, Lester Sargent. Claimant's posture was mildly slumped and his gait was somewhat slow. (Tr. at 711). He stated that he applied for benefits because he "got to where [he] couldn't do [his] job anymore as a bricklayer because of forgetfulness and pain." (Tr. at 712). On examination, Claimant's recent memory and concentration were moderately impaired, but his mental faculties and social functioning were otherwise normal or only mildly impaired. (Tr. at 714). Mr. Sargent diagnosed Claimant with moderate, recurrent major depressive disorder; generalized anxiety disorder; somatic symptom disorder with predominant pain; and mild provisional neurocognitive disorder due to traumatic brain injury. (*Id.*).

On April 18, 2018, Stephen Nutter, M.D. performed an internal medicine examination of Claimant, who reported back pain that radiated into his extremities and numbness and tingling in his arms. (Tr. at 720). Claimant had a normal gait and pulmonary and cardiovascular examinations. (Tr. at 722). He was not short of breath at rest or with exertion. (*Id.*).  Although he had pain on range of motion testing in his right knee, he had no crepitus, redness, warmth, swelling, laxity, or Homan's sign.[8] (Tr. at 722-23). Claimant also had neck pain on range of motion testing, but no tenderness or muscle spasm in his cervical spine. (Tr. at 723). In his lumbar spine, Claimant had pain on range of motion testing, tenderness, a positive straight leg raising test at 55 degrees on the right, and mild tenderness in his right hip, but he did not have hip pain on range of motion testing. (Tr. at 723). Claimant had full muscle strength in his extremities, no atrophy, preserved sensation, normal reflexes, and no clonus. (*Id.*). He could stand on one leg at a time without difficulty, walk on his heels and toes, and perform tandem gait without difficulty, although he had trouble squatting due to back and knee pain. (*Id.*). Dr. Nutter's impression was that Claimant had chronic cervical and dorsolumbar strain, shortness of breath due to an undetermined cause, and arthralgia. (*Id.*).

On July 21, 2017, Debra Lilly, Ph.D., performed a psychiatric review technique, based upon her review of Claimant's records, including the results of Claimant's consultative examination. (Tr. at 76). Dr. Lilly concluded that Claimant was moderately restricted in understanding, remembering, and applying information and maintaining concentration, persistence, or pace, but only mildly restricted in interacting with others and adapting or managing himself. (*Id.*). Dr. Lilly noted that Claimant's adult function

---

[8]   The Homan's sign examination tests for deep vein thrombosis. https://www.physio-pedia.com/Homan%27s_Sign_Test

report demonstrated that although Claimant did not visit family or friends "as often," Claimant picked his son up from school, was able to manage his finances, had hobbies that included reading and watching television daily, visited his mom, talked on the telephone, could pay attention all day and follow instructions "good." (Tr. at 76-77). Furthermore, Dr. Lilly noted that there was no evidence of mental health complaints other than during Claimant's consultative examination. (Tr. at 77). Although Claimant sought treatment for physical issues, he never sought treatment for mental complaints. (*Id.*). Therefore, Dr. Lilly stated that Claimant's reported symptoms at his consultative examination were unique and not reflected anywhere else in the record, even in the adult function report that Claimant completed. (*Id.*). In terms of Claimant's mental residual functional capacity, Dr. Lilly assessed that the evidence was inconsistent, but found that Claimant's moderate limitations did not prevent him from learning, recalling and performing one to three step tasks. (Tr. at 80-81). James Binder, M.D., affirmed this assessment on August 26, 2017. (Tr. at 112-13, 117-18).

On the same date of Dr. Lilly's report, July 21, 2017, Dominic Gaziano, M.D., assessed Claimant's physical RFC based upon a review of Claimant's records, including his internal medicine examination by Dr. Nutter. Dr. Gaziano opined that Claimant could perform work at the medium exertional level, including standing and/or walking and sitting for up to six hours in a work day; he could frequently climb ramps/stairs, balance, kneel, or crouch; occasionally climb ladders/ropes/scaffolds, stoop, or crawl; and could have no concentrated exposure to extreme cold, fumes/odors/dusts/gases, or hazards. (Tr. at 78-79). Dr. Gaziano explained the rationale of his RFC assessment, stating that although Claimant had chronic cervical and lumbar strain, his MRI did not show neuroforaminal impingement and there was no clinical evidence of radiculopathy. (Tr. at

80). As to his other impairments, Dr. Gaziano documented that Claimant's 2016 spirometry test was normal; his knee x-ray showed arthralgia with only mild abnormalities; and he suffered from sleep apnea. (*Id.*). Overall, Dr. Gaziano felt that Claimant exaggerated his impairments and their functional impact. (*Id.*). Rabah Boukhemis, M.D., affirmed this RFC assessment on August 23, 2017. (Tr. at 116-17).

### C. Claimant's Statements

At his administrative hearing on February 14, 2018, Claimant testified that he completed high school in regular education classes. (Tr. at 40). He stated that he could no longer work due to shortness of breath—which required him to use a rescue inhaler four times per day and a nebulizer two or three times per week—and due to back pain, which was exacerbated by walking or sitting too much or bending over. (Tr. at 41-42, 44). He described his back pain as dull. (Tr. at 53). His TENS unit sometimes knocked the edge off, but it was not very helpful, and injections did not relieve his back pain. (Tr. at 53, 55). Claimant also testified that he had carpal tunnel syndrome and his hands and arms were tingly and aching like he slept on them. (Tr. at 46, 54).

In terms of functional abilities, Claimant stated that he could walk approximately 100 feet and sit for half an hour. (Tr. at 45). He could lift five to eight pounds and had trouble reaching, particularly overhead, as well as difficulty opening and holding things without dropping them. (Tr. at 47). Claimant reported that he had a "lot" of neck pain that made it difficult for him to turn his head and caused headaches approximately four times per week during which he had to lie down in a dark, quiet place. (Tr. at 48, 52). Claimant acknowledged that he could shower and dress himself, go to the store occasionally, make light meals, and clean up after himself, but he stated that he did not do household chores or yard work. (Tr. at 49). He mainly spent his days watching television and could follow

the plot, and he also attended union meetings. (Tr. at 49-50). Yet, Claimant testified that

he had trouble remembering things, such as his appointments. (Tr. at 54-55).

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is

based upon an appropriate application of the law and is supported by substantial

evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

This Court is not charged with conducting a *de novo* review of the evidence. Instead, the

Court's function is to scrutinize the record and determine whether it is adequate to

support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting

this review, the Court does not re-weigh evidence, make credibility determinations, or

substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589

(4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as

a whole might support an inconsistent conclusion is immaterial, for the language of §

205(g) ... requires that the court uphold the [Commissioner's] decision even should the

court disagree with such decision as long as it is supported by 'substantial evidence.'"

*Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is

"not whether the claimant is disabled, but whether the ALJ's finding of no disability is

supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir.

2005) (citing *Craig*, 76 F.3d at 589).

# VII.  <u>Discussion</u>

As noted above, Claimant argues that the ALJ failed to properly evaluate the opinion evidence, consider whether his combination of impairments met a listing, or develop the record regarding his impairments. Each argument is discussed below, in turn.

## A.    *Medical Source Opinions*

Claimant argues that the ALJ "summarily ignored" the opinions of the treating and examining physicians, which he argues "supported his disability claim." (ECF No. 14 at 12). When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

substantial evidence.[9] *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[10] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

---

[9] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's DIB application was filed in November 2016, but his SSI application was not filed until June 2017. (Tr. at 261, 263). The undersigned applied the law in effect at the time that Claimant's DIB application was filed.

[10] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Claimant first alleges that the ALJ ignored the April 3, 2012 opinion of Dr. Walker,

which was rendered over four years before Claimant's alleged onset of disability.[11] Dr. Walker's report was prepared after Claimant was struck by an automobile on August 30, 2011 while mowing his lawn. Dr. Walker assigned whole person impairment percentages to Claimant based on the AMA Guides, which is used to evaluate workers' compensation claims in the state of West Virginia. (ECF No. 469-70). Based on Claimant's range of motion in his cervical spine, Dr. Walker assigned a whole person permanent impairment rating of 9 percent; based on Claimant's range of motion in his right shoulder, Dr. Walker assigned an impairment rating of 6 percent; based on Claimant's range of motion in his right hip and right knee, Dr. Walker assigned a 6 percent rating for Claimant's lower extremity; and, finally, although Dr. Walker was not a mental health professional, he consulted the DSM-IV and assigned a 15 percent rating for Claimant's post-traumatic stress disorder. (Tr. at 469-70). Dr. Walker combined the ratings related to Claimant's cervical spine, right shoulder, and PTSD for a total whole person impairment rating of 28 percent for the injuries sustained in the August 2011 incident. (Tr. at 470).

Contrary to Claimant's argument, the ALJ specifically considered Dr. Walker's opinion. As the ALJ noted, Dr. Walker provided an opinion, at the request of Claimant's attorney, as to Claimant's occupational abilities at that time based on the AMA Guides. (Tr. at 25). However, the ALJ noted that the evaluation was too remote, as significant treatment was obtained by Claimant after Dr. Walker's opinion. (*Id.*). Also, the ALJ found the opinion to be vague in terms of Claimant's functional abilities, noting that percentages of impairments, such as those assigned by Dr. Walker, are not terms used in the Social Security Administration's regulations. (*Id.*).

---

[11] The independent medical examination was conducted on April 3, 2012, but the report itself was prepared on July 10, 2012.

The ALJ's foregoing analysis is supported by substantial evidence. First, as the ALJ referenced, Dr. Walker's opinion was prepared shortly after Claimant was struck by an automobile, over four years before Claimant's alleged onset of disability, and the record reflected substantial treatment after that date. As discussed in the ALJ's decision, following Dr. Walker's 2012 opinion, Claimant had multiple MRIs, CT scans, and was examined by three neurosurgeons in 2017. (Tr. at 22-23); *see* (Tr. at 590-92, 737, 740-43, 748, 779-80). As late as August 2017, neurosurgeon Dr. Saulle recorded that Claimant had full cervical and lumbar range of motion and no muscle spasm, point tenderness, or bony step-offs. (Tr. at 748). Further, Dr. Saulle documented that, although Claimant's cervical spine MRI showed kyphotic angulation and some foraminal narrowing at C3-4, he did not have any spinal cord compression or signal changes. (*Id.*). Also, Dr. Saulle noted that, although Claimant had chronic compression fractures in his thoracic spine, his MRI was not significant for any spinal cord compression, signal changes, or foraminal stenosis. (*Id.*). Dr. Saulle further stated that Claimant's symptoms in his extremities did not appear to be originating from his neck and cervical spine surgery was not advisable. (Tr. at 749). Rather, Dr. Saulle scheduled Claimant for carpal tunnel release and ulnar decompression surgeries. (*Id.*). On later examination in January 2018, although Claimant still endorsed some neck pain, which extended into his shoulders, his sensation was intact, other than numbness in the tips of his fingertips, and his motor examination was normal, other than mildly reduced muscle strength of 4+/5 upon extension in his left knee. (Tr. at 814).

The above records were among the numerous clinical treatment notes, diagnostic tests, examinations, and evaluations that the ALJ considered from within the relevant period. (Tr. at 22-26). The ALJ correctly determined that Dr. Walker's opinion, dated four

years before Claimant's alleged onset of disability for the purpose of a one-time independent medical examination, was too remote, given the updated records in the case. Furthermore, although Dr. Walker's report provided some information regarding Claimant's range of motion testing at that time, it provided little indication of Claimant's functional abilities; such as, his ability to lift, carry, stand, walk, sit, or perform postural activities. Therefore, the ALJ properly discounted Dr. Walker's opinion on that basis.

Claimant next alleges that the ALJ summarily ignored the February 1, 2018 notation of Dr. Shiflett on a Division of Motor Vehicle's Parking Application for a Mobility Impaired Person, which stated that Claimant could not walk for 200 feet without stopping to rest. (ECF No. 14 at 13); *see* (Tr. at 823). As the ALJ noted, Dr. Shiflett prescribed a handicap placard because Claimant told him that he had shortness of breath when he walked 200 feet. (Tr. at 22). However, Claimant's oxygen saturations during that same February 1, 2018 visit were normal at rest and with ambulation, measuring 97 percent and 92 percent respectively. (Tr. at 22, 24); *see* (Tr. at 820). Indeed, the record reflected normal to moderate pulmonary functioning study results and normal oxygen levels. (Tr. at 25). Also, as the ALJ noted that, despite Claimant reported difficulty walking, he performed personal needs, shopped at the store, and attended union meetings. (Tr. at 24). Ultimately, the ALJ gave some weight to the fact that Claimant qualified for a mobility-impaired placard, but noted that it was not based on Social Security standards and did not set forth Claimant's functional abilities. (Tr. at 25).

The decision clearly reflects that the ALJ properly considered Dr. Shiflett's opinion and weighed it against the other evidence in the record. This analysis is supported by substantial evidence. In April 2016, Claimant complained of shortness of breath upon minimal exertion and he was prescribed Advair and rescue inhalers; he stated during his

next appointment in May 2016 that he was feeling so much better and it was "amazing" how much the medications helped him. (Tr. at 474, 477). During Claimant's April 2017 independent medical examination, Claimant did not have any shortness of breath on exertion. (Tr. at 722). His pulmonary function test in September 2017 showed only moderately severe restriction and his pulmonologist noted that his shortness of breath was stable. (Tr. at 763). Dr. Shweihat opined that Claimant's breathing restriction was likely due to thoracic cage abnormality due to his past injuries. (Tr. at 764). Therefore, the record supports the ALJ's assignment of only partial weight to Dr. Shiflett's opinion.

Finally, Claimant argues that the ALJ summarily ignored the December 2016 functional capacity evaluation provided by Dr. Smith, who opined on a check-box form, without any narrative explanation, that Claimant could stand and/or walk for less than two hours and sit for less than two hours in an eight-hour workday; needed to alternate between standing and sitting every 10 to 15 minutes; could occasionally climb ramps/stairs, kneel, or crouch, but never climb ladders/ropes/scaffolds or crawl; had limited ability to reach and feel; and must avoid concentrated exposure to wetness and moderate exposure to extreme temperatures, humidity, fumes, and hazards. (ECF No. 14 at 13); *see* (Tr. at 587).

The ALJ stated that she afforded little weight to Dr. Smith's opinion because it was not supported by objective evidence and was inconsistent with the overall objective finding of normal cervical and thoracic examinations and normal oxygen levels. (Tr. at 25). The ALJ cited numerous records to support her analysis. (*Id.*). For instance, Claimant's neurosurgeons documented in 2017 that Claimant had a normal gait, full range of motion in his spine, no muscle spasm, no point tenderness, and full strength during examinations. (Tr. at 748, 780). Although Claimant had some pain and tenderness

on range of motion testing during his April 2017 independent medical examination, he had full muscle strength, no atrophy, preserved sensation, normal reflexes, no clonus, and normal pulmonary and cardiovascular examinations. (Tr. at 722-23). Claimant could also stand on one leg at a time without difficulty, walk on his heels and toes, and perform tandem gait without difficulty, although he had difficulty squatting due to back and knee pain. (*Id.*). Claimant was not short of breath at rest or with exertion. (Tr. at 722). Furthermore, Claimant's cervical and thoracic spine MRIs did not demonstrate any severe findings and, as noted, Claimant's oxygen saturation level was normal as late as February 2018. (Tr. at 590-91, 740, 820).

Therefore, for the reasons stated above, the undersigned **FINDS** that the ALJ properly examined each of the foregoing medical source statements, weighed them, and provided clear explanations for the weight given to them. The ALJ supplied references to the evidence to clarify and support her conclusions, and her analysis is supported by substantial evidence.

### B.    *Combination of Impairments*

Claimant next argues that the ALJ failed to consider whether the combined effect of his impairments met a recognized listing. (ECF No. 14 at 14-15). A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. §§ 404.1525, 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set

at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will

be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

In this case, the ALJ concluded, with appropriate analysis and citations to the record, that Claimant's impairments, alone or in combination, did not meet or equal the criteria in the listings related to major dysfunction of a joint, peripheral neuropathy, disorders of the spine, ischemic heart disease, or chronic respiratory disorders. (Tr. at 19-20). In addition, the ALJ performed the special technique applicable to mental disorders, concluding, again with appropriate discussion and support from the record, that Claimant had only mild and moderate mental functional limitations and that Claimant's impairments did not meet or equal the listing for neurocognitive disorders. (Tr. at 20-21).

Claimant broadly argues that "[e]ven a cursory review of the evidence of record would conclude that the totality of the claimant's medical and mental problems, when combined, totally disable him and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability." (ECF No. 14 at 14). However, Claimant fails to point to any specific evidence or any listing that his combination of impairments purportedly meets. Given the fact that Claimant offers no further explanation, and upon review of the decision, the undersigned **FINDS** that the ALJ's step

34

three decision is supported by substantial evidence.

### C.    *Duty to Develop Record*

Finally, Claimant asserts that the ALJ failed to fully develop medical evidence regarding his arthritis in all joints, head injury, skull fracture, heart problems, restless leg syndrome, shoulder problems, speech impairment, low IQ, depression, carpal tunnel and ulnar syndromes, anxiety, post-traumatic stress disorder, neck and knee problems, hernia, and kidney stones. (ECF No. 14 at 12).

Claimant again articulates a legal standard related to this challenge, but fails to provide a factual basis to discern the applicability of that standard to the present case. Claimant does not identify any inadequacies or gaps in the record that the ALJ should have developed. The ALJ's duty was to ensure that the record contained sufficient evidence upon which she could make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *see also Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D. W. Va. Sept. 30, 2009). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

In this case, the transcript of proceedings contained the records of Claimant's clinical treatment; two independent mental examinations; two internal medicine examinations; opinions from treating, examining, and non-examining medical sources; as well as Claimant's adult function reports, pain questionnaires, and testimony during Claimant's administrative hearing. It is unclear what further information Claimant contends the ALJ should have developed. The undersigned **FINDS** that the record was

sufficient for the ALJ to make an informed decision and that there were not inadequacies or evidentiary gaps in the record for which the ALJ was obligated to develop the evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 14); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 15); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party,

Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  May 6, 2019

Cheryl A. Eifert
United States Magistrate Judge